USCA1 Opinion

 

 June 6, 1996 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-2167 WILLIE VICTOR ORTIZ-PI ERO, Plaintiff, Appellant, v. VICTOR RIVERA-ARROYO, INDIVIDUALLY AND AS MAYOR OF GURABO, ET AL., Defendants, Appellees.  ____________________ ERRATA SHEET The opinion of this Court issued on May 15, 1996, is amended as follows: Cover page: Change "[Hon. Hector M. Laffitte, U.S. District ______________ Judge" to "Hon. Jaime Pieras, Jr., Senior U.S. District Judge"  _____ __________________________ UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 95-2167 WILLIE VICTOR ORTIZ-PI ERO, Plaintiff, Appellant, v. VICTOR RIVERA-ARROYO, INDIVIDUALLY AND AS MAYOR OF GURABO, ET AL., Defendants, Appellees.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jaime Pieras, Jr., Senior U.S. District Judge] __________________________  ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________  ____________________ Carlos A. Del Valle Cruz for appellant. ________________________ Elisa Bobonis Lang, with whom Jos R. Gaztambide and Gaztambide & __________________ __________________ ____________ Plaza were on brief for appellees.  _____  ____________________ May 15, 1996  ____________________ 2 3 CYR, Circuit Judge. Plaintiff Willie Victor Ortiz CYR, Circuit Judge. _____________ Pinero ("Ortiz") appeals from a district court judgment dismiss- ing his political discrimination claims against the City of Gurabo, Puerto Rico, and its incumbent Mayor. We affirm. I I BACKGROUND BACKGROUND __________ In 1981, the City of Gurabo enacted an ordinance, pursuant to P.R. Laws Ann. tit. 3, 1351, designating eleven municipal offices as positions of "trust" or "confidentiality," including the directorship of the Office of Federal Programs ("OFP"), the municipal agency charged with obtaining and adminis- tering federal funding for various public works projects. See ___ Municipal Ordinance No. 3, Series 1981-82 (Sept. 14, 1981). In August 1991, then-Mayor Ramon Garcia Caraballo appointed Ortiz, a fellow member of the Popular Democratic Party (PDP), as OFP Director, and allegedly described the position to Ortiz as a non-"confidence" position. Mayor Caraballo later extended Ortiz' appointment through August 1993. In November 1992, however, after the PDP mayoral candidate was rejected by the electorate, outgoing Mayor Caraballo notified Ortiz that he should resign forthwith because the OFP directorship was a "confidential" position which the new administration was entitled to fill. Ortiz refused to resign. Thereafter, the incoming New Progressive Party (NPP) mayor, defendant-appellee Willie Victor Rivera Arroyo ("Rivera"), dismissed Ortiz.  In due course, Ortiz initiated the present action for 4 damages and reinstatement under 42 U.S.C. 1983 against the City of Gurabo and Mayor Rivera, claiming political discrimination and deprivation of his property interest in continued employment without the benefit of a pretermination hearing, in violation of the First and Fourteenth Amendments to the United States Consti- tution. The defendants moved for summary judgment on the ground that the OFP directorship is a "trust" position for which compat- ible political affiliation constitutes a legitimate qualifi- cation. See Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. ___ ______ ______ _____ Burns, 427 U.S. 347 (1976). Their motion was accompanied by a _____ written "certification" from the City personnel office defining the responsibilities of the OFP directorship.1 After determin- ing that the evidence compelled a finding that the OFP director- ship is a trust position, the district court granted summary judgment for defendants on all claims. Ortiz-Pinero v. Rivera- ____________ _______ Acevedo, 900 F. Supp. 574 (D.P.R. 1995).  _______ II II DISCUSSION DISCUSSION __________ A. Standard of Review A. Standard of Review __________________ We review de novo, to determine whether the pleadings, __ ____  ____________________ 1The certification lists five responsibilities: (1) "[t]o direct, coordinate and supervise all the operations of the Federal Programs Office"; (2) "[t]o see to the compliance and good functioning of said Office"; (3) "[t]o submit all the corresponding reports to the Municipal Services Administration Program, the State Agency delegated upon by the C.D.G.B. Pro- gram"; (4) "[t]o take part in seminars and training that are offered on the Federal Programs as well as to accompany the Mayor in all matters concerning the Program"; and (5) "[t]o perform other similar duties as assigned."  5 depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See O'Connor v. Steeves, 994 F.2d ___ ________ _______ 905, 906-07 (1st Cir.), cert. denied, 114 S. Ct. 634 (1993). _____ ______ Although all competent evidence and reasonable inferences are viewed in the light most favorable to Ortiz, he cannot carry the day on mere "`conclusory allegations, improbable inferences, and unsupported speculation.'" Id. (quoting Medina-Munoz v. R.J. ___ ____________ ____ Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990)). ____________________ B. First Amendment Claim B. First Amendment Claim _____________________ 1. Applicable Law 1. Applicable Law ______________ In a political discrimination case, the plaintiff first must show that party affiliation was a substantial or motivating factor for the challenged action. See Mount Healthy City Sch. ___ ________________________ Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Jirau- ___________________ _____ ______ Bernal v. Agrait, 37 F.3d 1, 3 (1st Cir. 1994).2 The burden ______ ______ then shifts to defendants to establish either a nondiscriminatory ______ reason for the dismissal, see Ferrer v. Zayas, 914 F.2d 309, 311 ___ ______ _____ (1st Cir. 1990), or that plaintiff held a "political" position __ for which party affiliation constituted an appropriate qualifica- tion for continued employment, see Branti, 445 U.S. at 518; De ___ ______ __ Choudens v. Government Dev. Bank of P.R., 801 F.2d 5, 8 (1st Cir. ________ ____________________________ 1986), cert. denied, 481 U.S. 1013 (1987). Thus, the Branti/- _____ ______ ______ _  ____________________ 2We assume, without deciding, that there is sufficient competent evidence that political affiliation motivated the dismissal.  6 Elrod defense is designed to ensure that "representative govern- _____ ment not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanc- tioned by the electorate." Elrod, 427 U.S. at 367.  _____ Whether a government position is "political" does not depend upon such loose-fitting labels as "confidential" or "policymaking," but on the substance of the duties inherent in _________ __ ___ ______ ________ __ the position itself. Branti, 445 U.S. at 518 (noting: "a ___ ________ ______ ______ position may be appropriately considered political even though it is neither confidential nor policymaking in character," and, by the same token, party affiliation is not a relevant consideration for all policymaking or confidential positions); see Romero ___ ______ Feliciano v. Torres Gaztambide, 836 F.2d 1, 3 (1st Cir. 1987) _________ __________________ (abjuring reliance on "rigid labels" in Branti/Elrod analysis).  ______ _____ We employ a two-part inquiry to identify "political" positions under the Branti/Elrod analysis:  ______ _____ First, we inquire whether the overall func- tions of the employee's department or agency involve "decision making on issues where there is room for political disagreement on goals or their implementation." Second, we decide whether the particular responsibili- ties of the plaintiff's position, within the department or agency, resemble those of "a policymaker, privy to confidential informa- tion, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate re- quirement" for continued tenure. Among the indicia material to the second element are "`relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.'"   7 O'Connor, 994 F.2d at 910 (quoting Jimenez Fuentes v. Torres ________ ________________ ______ Gaztambide, 807 F.2d 236, 241-42 (1st Cir. 1986) (en banc), cert. __________ _____ denied, 481 U.S. 1014 (1987)) (other citations omitted).  ______ Although obviously fact-intensive, the ultimate deter- mination whether a government position is "political" presents a question of law for the court, rather than an issue of fact for jury resolution. See McGurrin Ehrhard v. Connolly, 867 F.2d 92, ___ ________________ ________ 93 (1st Cir. 1989) (Breyer, J.) (noting that the "important constitutional and governmental interests surrounding the appli- cation of the [Branti/Elrod] exception" make it more suitable for ______ _____ determination by the court). Examining all competent evidence in the light most favorable to Ortiz, we conduct a de novo assess- __ ____ ment of the relevant factors, see In re Howard, 996 F.2d 1320, ___ _____ ______ 1327 (1st Cir. 1993) (plenary appellate review generally accorded issues of law), and "make a common sense judgment in light of the fundamental purpose to be served [by the Branti/Elrod analysis]." ______ _____ Jimenez Fuentes, 807 F.2d at 242.  _______________ 2. The OFP and "Partisan Political Interests" 2. The OFP and "Partisan Political Interests" _________________________________________ The OFP is charged with marshaling and administering the million or so dollars obtained annually from federal agen- cies, and with doling it out for various public works projects within the municipality. Thus, the OFP unmistakably is a munici- pal "department or agency [whose overall functions] involve `decision making on issues where there is room for political disagreement on goals or their implementation.'" O'Connor, 994 ________ F.2d at 910 (citations omitted). Indeed, its inherent responsi- 8 bilities inevitably entail the kinds of discretionary decisions traditionally associated with municipal politics.3 Accordingly, we conclude that defendants met the first-prong test under Jimenez Fuentes.4  _______________ 3. The Duties Inherent in the OFP Directorship  3. The Duties Inherent in the OFP Directorship  ___________________________________________ Under the second prong, we examine any evidence the defendants may have adduced that "the particular responsibilities __________ ________________  ____________________ 3See id. (noting that the first prong of the Jimenez Fuentes ___ ___ _______________ test was readily met where the municipal department for which plaintiff worked was responsible for developing and implementing public works programs, since "[e]lections often turn on the success or failure of the incumbent [administration] to provide these services"); Jimenez Fuentes, 807 F.2d at 242 (finding that _______________ regional director of commonwealth housing department, charged with ameliorating housing conditions among low and middle income families, was a position "relate[d] to partisan political inter- ests"); accord Juarbe-Angueira v. Arias, 831 F.2d 11, 15 (1st ______ _______________ _____ Cir. 1987) ("Where, how, and when the government will repair or reconstruct public buildings, . . . when and where money is to be spent, may well be a matter of considerable interest to . . . political leaders."), cert. denied, 485 U.S. 960 (1988); Mendez- _____ ______ _______ Palou v. Rohena-Betancourt, 813 F.2d 1255, 1260 (1st Cir. 1987) _____ _________________ (finding Administration for Environmental Quality Board engaged in a "politically-sensitive mission" for purposes of Branti/Elrod ______ _____ analysis). 4Ortiz also contends that the first prong of the Jimenez _______ Fuentes test should focus upon the City as the pertinent "depart- _______ ment or agency," not on the OFP. Ortiz does not contend that this shift in focus would alter the first-prong inquiry itself, since under either scenario the City or the OFP would have to undertake the politically sensitive mission of allocating federal funds among various constituencies within the municipality. He argues, instead, that the shift in focus could affect the inquiry under prong two, see infra Section II.B.3(b), since Ortiz could ___ _____ then be viewed as a subordinate City official rather than the head of the first-prong "department or agency" (i.e., the OFP). ____ Be that as it may, the attempt to distance Ortiz from political decisionmaking not only distorts the function of the second-prong inquiry under Jimenez Fuentes, but runs counter to our precedent _______________ in O'Connor, where we focused the inquiry under prong one upon ________ the municipal department of public works, rather than the munici- __________ _______ pality. See O'Connor, 994 F.2d at 907-08; supra note 3. ______ ___ ________ _____ 9 of the plaintiff's position, within the [OFP], resemble those of `a policymaker, privy to confidential information, a communica- tor, or some other office holder whose function is such that party affiliation is an equally appropriate requirement' for continued tenure." O'Connor, 994 F.2d at 910 (citations omitted) ________ (emphasis added). a) Lack of Written Job Description a) Lack of Written Job Description _______________________________ Ortiz first argues that summary judgment is precluded because the City of Gurabo has no official, written job descrip- tion (a.k.a. Form OP-16) for its OFP Director, nor indeed for any ___ of its municipal employees. He relies upon cases in which we have held that courts should determine the duties inherent in a particular position by examining the governmental entity's written, signed job descriptions, rather than the duties actually performed by the plaintiff or prior occupants of the position in question. See, e.g., Mendez-Palou v. Rohena-Betancourt, 813 F.2d ___ ____ ____________ _________________ 1255, 1260 (1st Cir. 1987). Ortiz would have us conclude that the absence of any written job description, combined with con- flicting circumstantial evidence as to the duties performed by the OFP director, leaves unresolved issues of material fact which preclude summary judgment. See Romero Feliciano, 836 F.2d at 3 ___ ________________ ("[W]e have considered the OP-16 dispositive in other Puerto Rico political discrimination cases . . . ."). In so doing, Ortiz misconstrues our precedents and the nature of the issue under consideration. Although written, signed job descriptions may provide 10 highly probative evidence as to the responsibilities inherent in a particular government position, and may even prove "disposi- tive," see id. at 3, we have never suggested that their absence ___ ___ _______ is dispositive, cf. Mendez-Palou, 813 F.2d at 1260 ("Whenever ___ ____________ ________ possible, we will rely upon this document because it contains ________ precisely the information we need . . . .") (emphasis added), or precludes a defendant from resorting to other evidence, see, ___ e.g., Romero Feliciano, 836 F.2d at 3 (noting that defendant "may ____ ________________ present additional evidence at trial" besides the disputed OP- 16). Nor does the absence of a written, signed job description preclude summary judgment, so long as defendants adduce other competent evidence as to the responsibilities inherent in the OFP directorship from which the "political" nature of the position can be determined as a matter of law, see McGurrin Ehrhard, 867 ___ ________________ F.2d at 93 (ultimately, the Branti/Elrod defense poses a question ______ _____ of law), even though some nonessential facts may remain in dispute. See Mariani-Giron v. Acevedo-Ruiz, 877 F.2d 1114, 1117 ___ _____________ ____________ n.5 (1st Cir. 1989).5  b) The Responsibilities Inherent in the Position  b) The Responsibilities Inherent in the Position _____________________________________________ Ortiz contends that the district court incorrectly  ____________________ 5The district court relied on the lack of a written job description as probative evidence that the OFP directorship is a __ "political" position. Ortiz-Pinero, 900 F. Supp. at 580 (citing ____________ Mendez-Palou, 813 F.2d at 1262-63 ("`[A]n employee with responsi- ____________ bilities that are not well defined or are of broad scope more likely functions in a policymaking position.'") (citing Elrod, _____ 427 U.S. at 368)). But since the City had adopted no job de- scription for any position, cf. supra note 1, and it obviously ___ ___ _____ could not reasonably be inferred on that basis that all City positions are "political," we give no weight to such an inference in the present context.  11 assessed the record evidence relating to the duties inherent in the OFP directorship. He claims that he administered the OFP in a politically-neutral fashion and took no meaningful part in mayoral "policymaking" or "political" decisions concerning federal funding allocations among the various constituencies within the municipality.  As previously noted, probative indicia that a position is "political" include "`relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.'" O'Connor, 994 F.2d at 910 (citations ________ omitted). Defendants adduced evidence that Ortiz had not had to compete with other candidates for the OFP directorship. More- over, Ortiz concedes that he was no "expert" in the financial and accounting aspects of the OFP's responsibilities. Thus, we think the evidence does not support a fair inference that Ortiz was selected for his managerial or technical expertise. Moreover, Ortiz' prominent PDP affiliation, see Ortiz Deposition at 179-81 ___ (acknowledging that, at various times, he was a "political activist," electoral commissioner, and campaign finance director for the PDP and PDP candidates), plainly permits a fair inference that he was selected for the OFP directorship based on his "political" service and talents. See McGurrin Ehrhard, 867 F.2d ___ ________________ at 93 (finding position "political" where plaintiff, formerly a clerical employee, was tapped for position as director of secre- 12 tary of state's regional office, after having worked on Secre- tary's state senate campaign, and where Secretary "did not advertise the job, solicit applications, or . . . consider any [other] applicant").  More importantly, Ortiz was appointed to head the OFP, ____ whose overall functions clearly involved "`decision making on issues where there is room for political disagreement on goals or their implementation,'" under the first prong of the Jimenez _______ Fuentes test. See supra Section II.B.2.6 By his own account, _______ ___ _____ Ortiz was in complete charge of the OFP staff,7 as well as the applications for, and the administering of, all federal grant and loan programs involving the City, amounting to approximately one-  ____________________ 6See, e.g., O'Connor, 994 F.2d at 911 ("[W]hatever difficul- ___ ____ ________ ties we might face in applying the second prong of the Jimenez _______ Fuentes test to subordinate positions within the Department, the _______ Superintendent's 'inherent responsibilities' . . . plainly '"had a bearing on the partisan goals and policies"' of the Department as a whole.") (citations omitted); De Choudens, 801 F.2d at 9-10 ___________ (noting that it would have been much more likely that the posi- tion would be considered "political" had plaintiff been president _________ of the bank, rather than senior vice-president); cf. Juarbe- ___ _______ Angueira, 831 F.2d at 15 (finding it not "clearly established" ________ that regional directorship of public building authority was other than a "political" position, even though it involved only a "'modicum' of 'policymaking responsibility,'" given that supervi- sory position was "moderately-high-level position within the agency").  7Ortiz points out that he supervised an OFP staff of only four persons (accountant, secretary, and two clerks). As we have noted, however, the relative staff size, not its absolute size, ________ affords the more illuminating insight. See, e.g., O'Connor, 994 ___ ____ ________ F.2d at 911 n.3 (noting that, on per-capita basis, plaintiff's supervision of smaller municipality-level staff may be equivalent to supervision of much bigger staff in a larger municipality); McGurrin Ehrhard, 867 F.2d at 95 (finding position "political" ________________ even though plaintiff supervised four-person regional office, where satellite branch was but one of two such offices in Massa- chusetts).  13 third of its municipal budget. See Ortiz Deposition, at 29-30.8 ___ Ortiz reported directly to the mayor, rather than through intermediaries, meeting with him on an average of six or seven times a year. Cf. Mendez-Palou, 813 F.2d at 1260 (noting ___ ____________ that plaintiff performed duties with "only general instructions and superficial supervision" from the administration). He served as the mayor's "eyes" and "ears," periodically visiting public work projects and reporting back to the mayor on their progress. See McGurrin Ehrhard, 867 F.2d at 95 (noting that employee who ___ ________________ acted as "eyes and ears" for secretary of state engaged in an "overtly political task[]").9 Such first-person (thus, more subjective) field assessments often influence policy formulation, and policymaking influence, even though indirect, is an important  ____________________ 8We reject the contention that the April 1993 certification of duties issued by the City personnel department, see supra note ___ _____ 1, is without any probative force because it is unsigned and was not prepared until after Ortiz left office. Of course, an OP-16 signed by the employee has added probative value since it consti- tutes the employee's contemporaneous "admission" concerning the duties inherent in the position. But it does not follow that the unsigned certificate, by which the City prospectively commits itself to its description of the duties inherent in the OFP directorship, is without probative weight. Although we have noted that an unsigned OP-16 may leave a factual dispute as to its authenticity, see Romero Feliciano, 836 F.2d at 3-4, Ortiz ___ ________________ asserts no challenge either to the authenticity or the validity of the certification. Nor did we suggest in Romero Feliciano _________________ that such evidence should be completely discounted in a trial on the merits.  9See Jimenez Fuentes, 807 F.2d at 246 (noting that "politi- ___ _______________ cal" position holders, like directors, "monitor the progress of the agency's programs and thus gauge the success of the Admini- stration's . . . policies"); cf. Mendez-Palou, 813 F.2d at 1260 ___ ____________ (finding it relevant that plaintiff "represents the President in activities . . . [and gives] top level counselling [to] the President"). 14 indicium of "political" positions.10 Ortiz admittedly received and reviewed copies of federal audits and oversight reports, including the Federal Transit Administration's Triennial Review of the City's federally funded transit program, which identified areas where the City was not in compliance. See Defendant's Exh. 6; see also 49 U.S.C.  ___ ___ ____ 5307(i) (2). This politically-sensitive report is precisely the type of document whose contents are not likely to be shared freely with any but the mayor's trusted political confidants for fear it might become fodder for the political opposition. Cf. ___ Mendez-Palou, 813 F.2d at 1262-63 ("[W]e believe that an official ____________ working in close contact with the head of a government agency is also more likely to be privy to a substantial amount of confiden- tial information. . . ."). Finally, Municipal Ordinance No. 3, enacted in 1981 pursuant to P.R. Laws Ann. tit. 3, 1351, designates only eleven municipal offices as positions of "trust" or "confidentiality," including the Director of the Office of Federal Programs.11  ____________________ 10See McGurrin Ehrhard, 867 F.2d at 94 (noting that plain- ___ ________________ tiff did not have "final authority to hire or fire employees, [but] she had 'input'"); Jimenez Fuentes, 807 F.2d at 245 ("That _______________ Regional Directors do not have final decision-making authority is not determinative . . . . 'because such positions [i.e., direc- torships] are a natural source of influential recommendations of changes in policy.'") (citation omitted). 11Section 1351 of the Personnel Act provides, in pertinent part: 1. Each [commonwealth] agency shall present for approval of the [Central] Office [of Personnel Administration] a plan containing the confidential positions by which it de- 15 Consistent with the ordinance, former Mayor Caraballo notified Ortiz in writing on December 24, 1992, that he was among the eleven municipal officials who must resign to make way for the incoming NPP administration.  Against this formidable array, Ortiz offers five arguments. First, he contends that Municipal Ordinance No. 3 is a nullity because the defendants have not shown that it was duly submitted to the Central Office of Personnel Administration for approval, as supposedly required by the Personnel Act. But see ________ ___ ___ supra note 11. This claim is unavailing.  _____ On its face, the ordinance reflects that it had been submitted to the Central Office of Personnel Administration ("Central Office") for review. See Municipal Ordinance No. 3,  ______ ___ 3. Thus, the burden lay with Ortiz to show that the City did not comply with the statutory requirements,12 and he proffered no  ____________________ sires to operate. In the case of municipali- ties, the Municipal Assembly shall follow the ordinance or resolution approving the plan submitted by the mayor and shall send it to the Office for the sole purpose of ascertain- ___ ___ ____ _______ __ __________ ing that the provisions of section 1350 of ___ ____ ___ __________ __ _______ ____ __ this title have been complied with. ____ _____ ____ ____ ________ ____ P.R. Laws Ann. tit. 3, 1351 (emphasis added).  12We recognize that the burden of proof normally shifts to the governmental entity to establish that the substantive re- ___________ quirements of its enactment comport with the First Amendment. But we have found no authority, nor can we discern any sound reason, for shifting the burden of proof where the challenging party alleges only procedural irregularities of nonconstitutional __________ dimension in an ordinance-enactment process. See, e.g., Friends ___ ____ _______ of the City Market v. Old Town Redev. Corp., 714 S.W.2d 569, 575 __________________ _____________________ (Mo. Ct. App. 1986) ("Ordinances are presumed to have been adopted in accordance with the requirements of the law . . . ."). 16 evidence that the ordinance was not duly submitted to the Central Office. See O'Connor, 994 F.2d at 906-07 (noting that summary ___ ________ judgment opponent must proffer more than "'conclusory allega- tions, improbable inferences, and unsupported speculation'") (citation omitted). In all events, the statutory language does not purport to make submission to the Central Office a prerequi- site to the validity of Municipal Ordinance No. 3. Rather, the ________ requirement of post-enactment compliance "review" by the Central Office, in relation to a municipal ordinance, stands in sharp __ ________ __ _ _________ _________ contrast to the heightened obligation of Commonwealth agencies to ____________ ________ seek Central Office approval. See P.R. Laws Ann. tit. 3, 1351 ________ ___ (mayor's "plan" to be submitted to Central Office "for the sole purpose of ascertaining that the provisions of section 1350 of this title have been complied with"). See Appendix A for text of ___ 1350. Second, Ortiz correctly notes that state laws identify- ing government positions as "trust" or "confidential" are not dispositive of the federal-law question whether a particular position is "political." See Jimenez Fuentes, 807 F.2d at 243 ___ _______________ n.9. On the other hand, we have explained that state laws and municipal ordinances designating positions as "trust" or "confi- dential" like P.R. Laws Ann. tit. 3, 1351, and Municipal Ordinance No. 3 are entitled to "some deference" under the Branti/Elrod formula, see Jimenez Fuentes, 807 F.2d at 246; ______ _____ ___ ________________ accord Juarbe-Angueira, 831 F.2d at 14, especially where other ______ _______________ evidence clearly points in the same direction. 17 Third, Ortiz attempts to estop defendants from assert- ing a Branti/Elrod defense by pointing to the putative assurance ______ _____ made to him by Mayor Caraballo in August 1991, that the OFP directorship was not a "trust" position, see supra p.2. Even ___ _____ this evidence is not hefty enough to ward off summary judgment, however.13  For one thing, application of the equitable estoppel doctrine against governmental entities, including municipalities, is narrowly circumscribed. See Heckler v. Community Health ___ _______ _________________ Servs. of Crawford County, 467 U.S. 51, 60-62 (1984). Moreover, __________________________ any attempt to interpose estoppel as a bar to the Branti/Elrod ______ _____ defense must fail, since reliance on the Caraballo representation would not have been objectively reasonable in the circumstances. See United States v. Javier Angueira, 951 F.2d 12, 16 (1st Cir. ___ _____________ ________________ 1991) (noting that even if estoppel is available against govern- mental entity, "`the party raising the [estoppel] defense must have reasonably relied on some "affirmative misconduct" attribut- able to the sovereign.'") (citations omitted); A.E. Alie & Sons _________________ v. United States Postal Serv., 897 F.2d 591, 593 (1st Cir. 1990) __________________________ (same).   ____________________ 13We note, as a threshold matter, that its admissibility is far from clear. See Fed. R. Civ. P. 56(e). Even assuming that ___ former Mayor Caraballo could bind the City by his representa- tions, see Fed. R. Evid. 801 (permitting "admissions" of party- ___ ______ opponent), it is extremely problematic whether the successor ________ mayor, defendant Rivera, can be bound, especially since the very nature of the 1983 claim made by Ortiz appears to preclude any characterization of former Mayor Caraballo as a party "opponent." As this evidence is otherwise deficient, however, we need not determine its competence at this time.  18 Immediately prior to his appointment to the OFP direc- torship, Ortiz, concededly a "political activist," served for three years as City assemblyman, a position which would have ___________ brought all City ordinances within his constructive knowledge. See Texaco, Inc. v. Short, 454 U.S. 516, 531 n.25 (1982) (noting ___ ____________ _____ that all persons are charged with knowledge of the provisions of duly enacted statutes/ordinances); Deibler v. City of Rehoboth _______ _________________ Beach, 790 F.2d 328, 331 (3d Cir. 1986) (same); cf. Good v. _____ ___ ____ Dauphin County Social Servs. for Children and Youth, 891 F.2d ______________________________________________________ 1087, 1091 (3d Cir. 1989) (reasonably competent government officials should know laws governing their conduct). Similarly, Ortiz admitted to having served for four years in a previous "trust" position, as Regional Director of the Administracion de Derecho al Trabajo, making it highly unlikely that he was not on actual notice of P.R. Laws Ann. tit. 3, 1351, or of the fact that municipalities were required to designate certain "trust" positions by ordinance. __ _________ Fourth, without citing either authority or a policy rationale, Ortiz argues that the OFP directorship cannot be considered a "political" position since there is no requirement that the municipal assembly approve the mayor's selection for the post. We think this far too thin a reed to warrant rejection of the traditional Branti/Elrod criteria. Many "political" appoint- ______ _____ ments (e.g., to the executive staff of a governor or mayor) are not subject to legislative approval, a requirement which corre- lates more closely to the issue of political accountability in 19 the legislative branch, than to the partisan political attributes of an executive position.  Finally, Ortiz insists that the OFP directorship duties actually performed by him under Mayor Caraballo were merely administrative and technical, that Caraballo alone decided how federal funds were to be spent, and that Ortiz merely informed the mayor regarding the administrative status of federal funding applications. These claims are insufficient to overcome the well-supported legal determination, see supra pp. 9-14, that the ___ _____ OFP directorship is a "political" position. At most, Ortiz' contrary characterizations, fully credited, establish the servic- es actually rendered by Ortiz while he served as the director, as distinguished from the responsibilities inherent in the position itself. Cf. Mendez-Palou, 813 F.2d at 1258 (actual duties not as ___ ____________ probative as inherent duties). As the ultimate issue presented is one of law, rather than fact, McGurrin Ehrhard, 867 F.2d at ________________ 93, summary judgment was warranted on the political discrimina- tion claim. C. Due Process Claim C. Due Process Claim _________________ Ortiz advances essentially the same arguments as support for the due process claim: that he had a legitimate expectation of continued employment under commonwealth law, which gave rise to a "property right" entitling him to a pretermination hearing. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 ___ _______________________ __________ (1985). The pretermination process due a government employee is a matter of federal law, see Rivera-Flores v. Puerto Rico Tel. ___ _____________ ________________ 20 Co., 64 F.3d 742, 749 (1st Cir. 1995), whereas the preliminary ___ question whether a government employee possessed a protectable "property right," or a legitimate expectation of continued employment, is controlled by the employment contract or state law. See id. ___ ___ Since Ortiz' employment contract included a clause permitting his unilateral, unconditional termination by the mayor at any time, commonwealth or local law would be the only possible basis for an actionable claim to continued employment. Accord- ingly, Municipal Ordinance No. 3 is dispositive of the due process claim, since it designates the OFP directorship as a "confidential" position, pursuant to P.R. Laws Ann. tit. 3,  1351. The Personnel Act in turn defines "confidential" appoint- ees as, inter alios, "those who intervene or collaborate substan- _____ _____ tially in the formulation of public policy, who advise directly or render direct services to the head of the agency," and are subject to "free selection and removal." Id. 1350. Thus, Ortiz ___ had neither a property right nor a contract right to continued employment as OFP Director, and defendant-appellee Rivera was under no constitutional obligation to afford him a pretermination hearing. III III CONCLUSION CONCLUSION __________ The claims for damages are barred under the doctrine of qualified immunity, because Ortiz failed to demonstrate that it was "clearly established" that the OFP directorship was not a 21 "political" position. See Mendez-Palou, 813 F.2d at 1259-60. ___ ____________ Furthermore, since we conclude as a matter of law that the OFP directorship was indeed a "political" position, the claims for damages and reinstatement are foreclosed on the merits. Finally, ___ _____________ the due-process claim fails because Ortiz possessed no right to, or reasonable expectation of, continued employment as OFP direc- tor.  The judgment is affirmed; costs to appellees. The judgment is affirmed; costs to appellees. ____________________________________________ 22 Appendix A __________ LAWS OF PUERTO RICO ANNOTATED TITLE THREE. EXECUTIVE CHAPTER 51. PUBLIC SERVICE PERSONNEL SUBCHAPTER V. PERSONNEL ADMINISTRATION SYSTEM; STRUCTURE 1350. Confidential employees Confidential employees are those who intervene or collabo- rate substantially in the formulation of the public policy, who advise directly or render direct services to the head of the agency, such as: (1) Officers appointed by the Governor, their personal secretaries and drivers; as well as their executive and adminis- trative assistants who answer directly to them. (2) Heads of agencies, their personal secretaries and drivers; as well as their executive and administrative assistants who answer directly to them. (3) Assistant heads of agencies and their personal secretar- ies and drivers. (4) Regional directors of agencies. (5) Personal secretaries and drivers of officials selected by popular election, as well as their assistants who answer directly to them. (6) Members of boards or standing committees appointed by the Governor and their respective personal secretaries. (7) Members and personnel of boards or commissions appointed by the Governor having a specific period of effectiveness. (8) Personnel of the offices of the Puerto Rico Ex-Govern- ors. Confidential employees shall be of free selection and removal. Likewise confidential shall be those employees who though of free selection may be removed only for good cause by provision of law or those whose appointment is for a term pre-- fixed by law. Every regular employee in a career position who is appointed to a confidential position shall be entitled to be reinstated in a position equal or similar to the last one he held in the career service. i